**LAW OFFICE OF ROOSEVELT N. NESMITH, LLC**
Roosevelt N. Nesmith (roosevelt@nesmithlaw.com)
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
Tel: (973) 259-6990
Fax: (866) 848-1368

**GISKAN SOLOTAROFF ANDERSON & STEWART LLP**
Catherine E. Anderson (canderson@gslawny.com) (pro hac pending)
11 Broadway, Suite 2150
New York, New York 10004
Tel: (212) 847-8315
Fax: (646) 520-3236

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____

JAMES AND BARBRA BOWLES,
on behalf of themselves and all
others similarly situated,

|  |  |
|---|---|
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **AND JURY DEMAND** |

WILSHIRE CREDIT CORPORATION,
BAC HOME LOANS SERVICING, LP,
BANK OF AMERICA, N.A, INTERNATIONAL
BUSINESS MACHINES CORPORATION,
SETERUS, INC. f/k/a IBM LENDER BUSINESS
PROCESS SERVICES, INC., ZC STERLING
INSURANCE AGENCY, QBE
FIRST INSURANCE AGENCY INC., and QBE
INSURANCE CORPORATION,

Defendants.

_____

Plaintiffs James Bowles and Barbra Bowles ("Plaintiffs") bring this class action

complaint on behalf of themselves and all others similarly situated, against defendant Wilshire

Credit Corporation ("Wilshire") and defendants BAC Home Loans Servicing, LP ("BACHL"),

Bank of America, N.A ("BANA", and collectively with BACHL, the "BOA Defendants"),

International Business Machines Corporation ("IBM"), Seterus, Inc. f/k/a IBM Lender Business Process Services, Inc. ("Seterus," and collectively with IBM, the "IBM Defendants") and/or their related affiliates and subsidiaries, as successors in interest to Wilshire (collectively, the "Loan Servicing Defendants" and/or successors in interest to Wilshire), and defendants ZC Sterling Insurance Agency, Inc. ("ZC Sterling"), QBE FIRST Insurance Agency, Inc. ("QBE FIRST"), QBE Insurance Corporation ("QBE") and collectively, the "QBE Defendants") (and together with the Loan Servicing Defendants and/or successors in interest to Wilshire Credit Corporation, the "Defendants").  Plaintiffs file this class action complaint to redress the wrongful conduct of Wilshire and the QBE Defendants in manipulating the force-placed insurance market through collusive agreements involving kickback arrangements and other forms of improper compensation with respect to hazard insurance force-placed on Plaintiffs' residential mortgage loan by Wilshire and the QBE Defendants on or around January 18, 2010.  Plaintiffs do not challenge the ability of Wilshire to obtain force-placed insurance to protect its interest in Plaintiffs' loan as set forth in the mortgage agreement, but challenge the manner in which Wilshire manipulated the force-placed insurance process in order to enrich itself and the QBE Defendants at the expense of Plaintiffs and the Class.

### The Parties

### Plaintiffs

1.      Plaintiffs James and Barbra Bowles are citizens of New Jersey and reside at 7 Fielding Court, South Orange, New Jersey.  From approximately May 2007 through January 18, 2010, Plaintiffs were charged bi-annually by Wilshire for force-placed hazard insurance provided by ZC Sterling, for total annual charges of approximately $4,722.57.  Wilshire last charged

Plaintiffs for force placed hazard insurance which it obtained from ZC Sterling on or around January 18, 2010, in the amount of $2,450.88.

**The Loan Servicer Defendants and/or Successors in Interest to Wilshire**

2.      Defendant Wilshire is a Nevada corporation with its headquarters located at 14523 S.W. Millikan Way, Suite 200, Beaverton, Oregon.  Wilshire was established in 1987 as a residential mortgage loan servicing company focusing on the sub-prime market.  Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch") purchased Wilshire from Wilshire Finance Services Group Inc. on April 30, 2004.  Bank of America Corporation ("BAC") acquired Wilshire as part of its acquisition of Merrill Lynch in January 2009.  According to a Global Credit Research report by Moody's Investor Services dated March 1, 2010, Wilshire's servicing portfolio totaled 136,369 loans, with an unpaid balance of approximately $18.9 billion as of April 30, 2009.  Wilshire was registered to do business in New Jersey on March 12, 1999, and was merged on March 18, 2010.  The last registered agent and registered office of record for Wilshire in the State of New Jersey is Corporation Service Company, 830 Bear Tavern Road, West Trenton, NJ 08628.

3.      Defendant BANA is a Delaware corporation and national banking association insured by the Federal Deposit Insurance Corporation.  BANA has its principal place of business at 100 North Tryon Street, in Charlotte, North Carolina.  BANA is a direct wholly-owned subsidiary of BAC.  BANA provides services including, but not limited to, banking, insurance, investments, property mortgages, and consumer and commercial finance in New Jersey and across North America.  BACHL was merged into BANA on or about July 1, 2011.  Notwithstanding this merger, this suit is brought directly against BACHL (through its successor-

in-interest, BANA) and BANA is liable for the conduct of BACHL alleged herein, as a result of the merger and as successor in interest to Wilshire.

      4.     Defendant  BACHL a former subsidiary of BAC, was a Texas limited partnership that serviced mortgage loans, including residential mortgage loans originated or owned by BANA.  IBM announced that it had finalized its acquisition of the core operating assets of Wilshire from BAC on March 1, 2010.  Upon information and belief, BAC retained most, but not all, of the mortgage servicing rights and related assets of Wilshire, which was merged into BACHL.  The loans acquired by BAC and previously serviced by Wilshire were then serviced by BACHL.  Wilshire's mortgage loan servicing rights not transferred to BAC as part of the transaction were transferred to IBM.

      5.     Defendant IBM is a multinational technology and consulting corporation. IBM is incorporated in the State of New York and maintains its corporate headquarters at 1 New Orchard Road in Armonk, New York.  IBM announced that it would buy the core operating assets of Wilshire from BAC in October 2009.  IBM stated at the time that the Wilshire business would become part of the IBM Lender Business Process Services unit.  IBM announced that it had finalized its acquisition of the core operating assets of Wilshire from BAC on March 1, 2010.  Upon information and belief, BAC retained most, but not all, of the mortgage servicing rights and related assets of Wilshire, which was merged into BACHL.  The loans previously serviced by Wilshire were serviced by BACHL, as the successor in interest to Wilshire, commencing March 1, 2010.  IBM began servicing the balance of loans pursuant to the former Wilshire mortgage servicing rights not transferred to BAC.

      6.     Defendant Seterus is a Delaware corporation with its headquarters at 14523 S.W. Millikan Way, Suite 200, Beaverton, Oregon 97005-2352.  Seterus services residential mortgage

loans in New Jersey and throughout the United States.  IBM rebranded its mortgage services

division formerly known as the Lender Business Process Services unit as Seterus in 2011.

Seterus is named as a defendant as a successor in interest to Wilshire Credit Corporation.

### The Force-Placed Insurance Provider Defendants

7.     Defendant ZC Sterling Insurance Agency, Inc. ("ZC Sterling") is a California

corporation formerly located at 210 Interstate North Parkway, Suite 400, Atlanta, Georgia.  In

May 2010, ZC Sterling changed its name to Sterling National Insurance Agency, Inc. ("Sterling

National"), which then changed its name to QBE FIRST in May 2011.

8.     Defendant QBE FIRST is a California corporation with its headquarters located at

9800 Muirlands Boulevard, Irvine, California  92618.  QBE FIRST is a subsidiary of QBE

Holdings Inc., a Delaware corporation and insurance holding company.  QBE FIRST acts as the

program manager for QBE's force-placed insurance programs and also provides outsourced

services to mortgage servicers.  QBE FIRST conducts business in New Jersey and throughout the

United States.  QBE Holdings, Inc. acquired ZC Sterling in 2008 and renamed it QBE FIRST in

2011.

9.     Defendant QBE is a Delaware corporation with its headquarters at 88 Pine Street,

New York, New York 10005.  QBE writes force-placed insurance for hazard coverage in the

State of New Jersey and throughout the United States

### NATURE OF THE CASE

10.     Plaintiffs James and Barbra Bowles bring this class action complaint to redress

Defendants' wrongful conduct in manipulating the force-placed insurance market through

collusive agreements involving kickback arrangements and other forms of improper

compensation. Defendant Wilshire charged the Bowles for force-placed insurance for nearly

three years, beginning in May 2007.  The insurance was procured for Wilshire by ZC Sterling (now QBE FIRST) from QBE.  Plaintiffs do not challenge Wilshire's ability to obtain force-placed insurance to protect its interest in Plaintiffs' loan as set forth in the mortgage agreement, but challenge the manner in which Wilshire manipulated the force-placed insurance process in order to enrich itself and the other Defendants at the expense of Plaintiffs and the Class.

11.     Upon information and belief, and the investigation by the New York State Department of Financial Services into the force-placed insurance business practices of the QBE Defendants, Wilshire purchased force-placed hazard insurance from ZC Sterling, now known and doing business as QBE FIRST, pursuant to a prearranged agreement which returned a financial benefit to defendant Wilshire and/or its affiliates unrelated to any contractual or bona fide interest in protecting Wilshire's interest in the loan.   Pursuant to its agreement, Wilshire purchased unconscionably high-priced insurance policies from ZC Sterling, and in exchange, Wilshire and/or its affiliates, received fees, payments, commissions, kickbacks or other things of value from ZC Sterling.

12.     In *In the Matter of QBE Financial Institution Risk Services, Inc., QBE Insurance Corporation and QBE Holdings, Inc.* (the "NYDFS Consent Order the New York State Department of Financial Services, Financial Frauds & Consumer Protection Division ("NYDFS")), the NYDFS made the following findings of fact concerning the relationship among ZC Sterling, QBE FIRST and QBE, and their involvement in the force placed insurance market in the United States.

13.     As set forth in the NYDFS Consent Order, ZC Sterling managed force placed insurance programs, primarily those of Zurich in North America underwriting companies, including, but not limited to, Empire Fire and Marine Company.  The QBE Defendants' parent

6

corporation, QBE Holdings, Inc. ("QBE Holdings") acquired ZC Sterling in December 2008.  In May 2010, ZC Sterling changed its named to Sterling National Corporation, which then changed its name to QBE FIRST in 2011.

14.     The NYDFS Consent Order found that in 2007, ZC Sterling received a commission of 50% of net written premium in connection with force-placed policies it placed on behalf of insurers.  This 50% commission was in addition to contingent "profit" commissions which ZC Sterling (now QBE First) would receive on its force placed policies.  Both QBE and Empire Fire and Marine (and upon information and belief, other ZC Sterling force placed insurance providers) paid ZC Sterling a contingent "profit" commission when loss ratios were kept below a certain figure, which has ranged from 34% to 45.6%, which is well below the expected loss ratio of 55%.  This created a troubling incentive for ZC Sterling to keep loss ratios as low as possible.

15.     As per the NYDFS Consent Order, defendant ZC Sterling made lump sum payments to loan servicers and affiliates of loan servicers in connection with agreements between the loan servicer and/or its affiliate to retain ZC Sterling to be their preferred force placed insurance providers.  For example, in 2008 ZC Sterling paid nearly $10 million plus commissions to American Home Mortgage Servicing Inc.'s affiliated insurance agency in exchange for an agreement that ZC Sterling would provide American Home Mortgage Servicing Inc. with force placed insurance for its entire loan portfolio.

16.     The NYDFS Consent Order concluded that the high cost of force placed insurance, including ZC Sterling's force-placed policies, "is due at least in part to the relationships between the mortgage servicers and their affiliates and payments by force-placed insurers and their affiliates, including QBE, to such servicers and their affiliates."  The NYDFS

Consent Order found that the high cost of these kickback arrangements is passed on to the homeowner, who has no voice in selecting a force placed provider. "While servicers choose the force-placed product for their mortgage loan portfolio, the high premiums are charged to homeowners, and in the event of foreclosure, costs are passed onto investors."

17.    With respect to the above referenced wrongful practices of ZC Sterling, the NYDFS Consent Order provided injunctive relief and actual damages to eligible homeowners, but the relief was limited to citizens of New York.  Additionally, in *Hall v. Bank of Am., N.A.*, 2014 U.S. Dist. LEXIS 177155, *10-11 (S.D. Fla. Dec. 17, 2014), a nationwide class action was settled for similar force placed insurance allegations brought against Bank of America, N.A., and various subsidiaries.  Plaintiffs were not included in that settlement class despite BAC Home Loan Servicing LLP's acquisition of the bulk of the Wilshire loan portfolio servicing rights at the end of March 2010.[1]  The members of the Class whom Plaintiffs here seek to represent also were not included in *Hall* settlement class and did not obtain relief from the NYDFS settlement.

18.    Wilshire's desire to reap greater profit through its prearranged agreements with ZC Sterling/QBE FIRST, lead it to select the more expensive force-placed insurance from ZC Sterling/QBE FIRST for its borrowers.  As a result, the force-placed premium was greater than

---

[1] The *Hall* settlement class was defined as "All borrowers who had mortgage loans, home equity loans, and home equity lines of credit serviced by Bank of America, N.A. or BAC Home Loans Servicing, LP, (formerly known as Countrywide Home Loans Servicing, L.P.) who were charged a premium for lender-placed hazard insurance coverage issued by Balboa Insurance Company, Meritplan Insurance Company, Newport Insurance Company, QBE Insurance Corporation, QBE Specialty Insurance Company, Praetorian Insurance Company, or one of their affiliates within the Class Period [January 1, 2008 through February 3, 2014]. *Id.*

the premium charged for voluntary hazard insurance, even though the force-placed insurance policy typically provides far less coverage.   Through this manipulation of the force-placed insurance selection process, Defendants maximized their own profits to the detriment of Plaintiffs and the other members of the Class.

### The Force-Placed Insurance Industry

19.     Lenders and servicers force-place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to force-place a new policy on the property to protect its interest in the loan and to charge the premium to the borrower.

20.     The Defendants' force-placed insurance scheme takes advantage of the discretion afforded the lenders and/or servicers in standard form mortgage agreements.   The mortgage agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.   If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

21.     Force-placed insurance providers, like ZC Sterling (now QBE FIRST), enter into exclusive relationships with mortgage lenders and servicers to provide the force-placed policies.  To maintain their exclusive relationships with these lenders and servicers, the force-placed insurers pay them unearned "kickbacks" as a percentage of the force-placed premiums ultimately charged to the borrower, offer them subsidized administrative and loan tracking services, and/or provide other financial benefits which are not attributable to the cost of insuring the property.  The money to finance the force-placed insurance scheme comes from unsuspecting

borrowers, upon whom are imposed force-placed policies that are far more expensive than their voluntary insurance.

22.     In many instances, borrowers are required to pay for backdated insurance coverage to cover periods of time that have passed and during which no claims were made, to pay for duplicative coverage, or coverage that exceeds contractual requirements.

23.     During a 2012 hearing on force-placed insurance at the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, an expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[2]

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|------|------|------|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004–2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

24. QBE, which acquired ZC Sterling in or around 2008, is one of a small number of insurance companies that control virtually the entire market for force-placed insurance. Large mortgage lenders and servicers sustain the few insurers' market dominance by agreeing to purchase all force-placed insurance from the insurers in exchange for kickbacks disguised as commissions and other benefits.

25. It is no surprise that the Defendants' practices have come under increased scrutiny in recent years by the government and regulators. See NYDFS Consent Order references to the actions of ZC Sterling, QBE Holdings, and QBE FIRST in paragraphs 12 through 19 above. New Jersey, which was not subject to the NYDFS 2011 Consent Order with QBE, is a substantial market for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated that while Florida is "ground zero," New Jersey has been the sixth largest market for force-placed insurance policies in the county.

---

[2] This graph and the ones that follower are from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at: http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

## LPI Premium by State:  Florida Has Become Ground Zero

|     | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|-----|------|------|------|------|------|------|------|------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8% | 8.7% | 7.0% | 5.6% | 5.6% | 6.1% |
| NY  | 3.6% | 3.6% | 4.5% | 4.4% | 4.3% | 4.7% | 5.4% | 5.6% |
| IL  | 3.0% | 3.3% | 3.9% | 3.7% | 3.9% | 4.4% | 4.1% | 4.6% |
| NJ  | 2.9% | 2.7% | 2.9% | 2.7% | 2.7% | 2.9% | 3.4% | 4.0% |
| MI  | 4.2% | 4.4% | 4.4% | 5.8% | 3.6% | 2.7% | 2.2% | 2.0% |
| OH  | 3.6% | 3.8% | 3.5% | 2.7% | 2.4% | 2.2% | 2.3% | 2.9% |
| GA  | 3.4% | 3.2% | 3.2% | 2.4% | 2.3% | 2.3% | 2.3% | 2.3% |
| PA  | 2.6% | 2.6% | 2.7% | 1.8% | 1.8% | 1.8% | 1.7% | 1.8% |

CEJ LPI Presentation to NAIC                                    15                                    August 9, 2012

26.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of a Class of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by Wilshire (the assets and liabilities and/or servicing rights and related assets and liabilities now held by Seterus, and/or BAC Home Loans Servicing LP/Bank of America, N.A.) and ZC Sterling, now QBE FIRST.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.)

28.     There is complete diversity between Plaintiffs and the Defendants. Plaintiffs James and Barbra Bowles are citizens of New Jersey.  Defendant Wilshire is a citizen of Nevada and Oregon. Defendant Bank of America, N.A., whose predecessor BAC purchased the assets and liabilities of Wilshire as part of its Merrill Lynch acquisition in or around January 2009, is a citizen of North Carolina. Defendant IBM, which purchased the assets of Wilshire and made them part of its Lender Business Process Services in or around March 2010, is a citizen of New York. Defendant Seterus, the name of IBM's Lender Business Process Services unit as of 2011 which acquired the assets of Wilshire, is a citizen of Oregon.  Defendant ZC Sterling is a citizen of California and Georgia.  Defendant QBE FIRST, which ZC Sterling was renamed in or around 2011, is a citizen of California and Georgia.  Defendant QBE Holdings, which originally purchased ZC Sterling, is a citizen of Delaware and New York. The  amount in controversy exceeds $5,000,000, and there are at least one hundred members of the putative class.

29.     This Court has jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in New Jersey, are doing business in New Jersey and have registered with the New Jersey Secretary of State, or do sufficient business in New Jersey, have sufficient minimum contacts with New Jersey, or otherwise intentionally avail themselves of the New Jersey consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in New Jersey.  This

13

purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

30.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d) (2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

31.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the District of New Jersey.

32.     All conditions precedent to this action have occurred, been performed, or have been waived.

## **FACTUAL ALLEGATIONS**

33.     The standard form mortgage agreements for loans serviced by Wilshire include a provision requiring the borrower to maintain hazard insurance coverage on the property securing the loan.   In the event that the hazard insurance lapses, the standard form mortgage agreements permitted Wilshire to obtain force-placed coverage to protect the lender's interest in the loan and to charge the cost of the insurance to the borrower rather than declare the borrower in default.

34.     What was unknown to borrowers, and not disclosed in the standard form mortgage agreements, is that Wilshire had exclusive arrangements with ZC Sterling and its affiliates, including QBE Holdings and defendant QBE FIRST, to manipulate the force-placed

insurance market and artificially inflate charges to Plaintiffs and the class. The charges are inflated to provide Wilshire with kickbacks, disguised as "commissions," and to provide other financial benefits which are not attributable to the cost of insuring the individual property.

## The Force-Placed Insurance Scheme

35.     ZC Sterling, now QBE FIRST, had exclusive arrangements with Wilshire to monitor its mortgage portfolios and provide QBE force-placed insurance.   In addition to the subsidized mortgage services it receives from ZC Sterling, as set forth in detail below, Wilshire and/or its affiliates were kicked back a percentage of the force-placed premium from the QBE Defendants.

36.     The scheme worked as follows:  Wilshire purchased QBE master or "umbrella" insurance policies that cover the entire Wilshire portfolio of mortgage loans through ZC Sterling/QBE FIRST.  In exchange, ZC Sterling/QBE FIRST was given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.  ZC Sterling/QBE FIRST monitored Wilshire's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, ZC Sterling/QBE FIRST, or one of its affiliates, sent notice to the borrower in the name of Wilshire, stating that it has purchased insurance on behalf of the borrowers, for which the borrowers will be financially responsible, and force-placed it on the property.  It further stated that the insurance charges will be applied to the borrower's loan plus interest.

37.     No individualized underwriting ever took place for the force-placed coverage. The insurance was automatically placed on the property and the premium charged to the borrower.  As J. Robert Hunter stated in his testimony before the NYDFS, "lack of underwriting

15

should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." Thus, the lack of individual underwriting should decrease, not increase, the cost of force-placed insurance.

### Plaintiffs James and Barbra Bowles

38.     Plaintiffs James and Barbra Bowles took a mortgage loan from defunct sub-prime lender Freemont General Corporation in 2005, secured by a mortgage on real property in South Orange, New Jersey.   Plaintiffs' mortgage loan was serviced by Wilshire from February 2006 until February 2010, when the servicing rights were transferred to Green Tree Financial.

39.     Plaintiffs' mortgage agreement provides as follows:

> 5. **Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods Lender requires.
>
> * * * *
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payments.
>
> * * * *
>
> 9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . .  then Lender may do and pay for whatever is

16

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]

\* \* \* \*

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

40.     Wilshire and ZC Sterling force-placed insurance policies on Plaintiffs' property in May 2007in the amount of $2,3150.04, in October 2007 in the amount of $2,320.44, in January 2008 in the amount of $2,357.57, in June 2008 in the amount of $2,365.00, in September 2009 in the amount of $2,491.50, and on or around January 18, 2010, in the amount of $2,450.88.   Plaintiffs previously had paid an annual premium of only $1,306.00 for homeowner's insurance coverage which they obtained on the open market.   Thus, the force-placed hazard insurance policy issued by ZC Sterling and placed by Wilshire on Plaintiffs' property had an annual premium of at least double, and in some years more than triple, the price of Plaintiffs' voluntary policy obtained in the open market.   The force placed policies, moreover, provided far less coverage that Plaintiffs' voluntary homeowner's policy.   The inflated force-placed insurance charges are reflected on Plaintiffs' escrow statement dated February 25, 2010.

41.     Plaintiffs received notice from Wilshire on or around January 28, 2008, stating, *inter alia*, that "At your expense, we have purchased a renewal insurance policy to protect our interest in the property.   The premium cost for purchasing this insurance is shown on the attached policy declaration.   You are solely responsible for the repayment of this cost.   The premium for the attached policy may be charged to your escrow account. . . . . You will be responsible to pay any costs which result from our purchase of this insurance."   The "cost" for the force placed hazard insurance purchased by Wilshire through ZC Sterling was represented in

the accompanying Empire Fire and Marine Insurance Company force placed hazard policy as $2,357.57.   Plaintiffs were charged this amount, or a similar amount, bi-annually by Wilshire for the Empire Fire and Marine force placed hazard policy obtained through ZC Sterling for total charges of $4,722.57 for force placed hazard insurance in 2008.

      42.    Plaintiffs received another notice from Wilshire on or around September 18, 2009, stating, *inter alia*, "we have purchased a lender placed hazard insurance policy to protect our interest in the property.  The premium cost for purchasing this insurance is shown on the attached policy declaration. You are solely responsible for repayment of this cost. . . . The premium for the attached policy may be charged to your escrow account. . . You will be responsible to pay the costs which result from our purchase of this insurance."  The "cost" for the force placed hazard insurance purchased by Wilshire through ZC Sterling was represented in the accompanying QBE Insurance Corporation force placed hazard policy to be $2,491.50. Plaintiffs were charged this amount, or a similar amount, bi-annually by Wilshire for the QBE Insurance Corporation force placed hazard policy obtained through ZC Sterling.

      43.    Plaintiffs received another notice from Wilshire on or around December 4, 2009, stating, *inter alia*,

> Last year, we purchased a lender placed hazard insurance policy to protect our interest in the property shown above. . . . The policy that we purchase last year will expire 01/18/10.  We have requested that a renewal policy be issued to protect our interest. The renewal policy will be effective as of the expiration date of your current lender placed insurance policy.  The premium for the renewal policy may be charged to your escrow account in accordance with your loan documents unless prohibited by applicable state law. . . You will be responsible to pay the costs which result from our purchase of this insurance.

      44.    The December 4, 2009 notice also provided that ZCSIA (ZC Sterling) is the agent for and obtains insurance coverage from QBE Insurance Corporation."  According to Plaintiffs'

escrow statement, Plaintiffs were charged on or around January 18, 2010 for this force placed hazard insurance policy in the amount of $2,450.88.There were no material differences between these actions and practices of, Wilshire and the QBE Defendants directed to Plaintiffs and their actions and practices directed to the Class.

45.     Once coverage is forced on the property, Wilshire and the QBE Defendants charged Plaintiffs an amount they attributed to the force-placed premium, which was either deducted from the borrower's mortgage escrow account by Wilshire and/or ZC Sterling/QBE FIRST or added to the balance of the borrower's loan.[3]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

46.     What is not disclosed to Plaintiffs and other borrowers in any of the notices they received from Wilshire concerning the force placed insurance, is that while Wilshire paid the premiums to ZC Sterling/QBE FIRST, it then kicked back a set percentage of the premium to Wilshire as a "commission."   Upon information and belief, Wilshire and its affiliates may also have received kickbacks from ZC Sterling, and/or the QBE Defendants in the form of "soft dollar" credits.

47.     QBE Holdings, which purchased ZC Sterling in or around 2008, has acknowledged that they paid unearned "commissions" (i.e., "kickbacks") in connection with force-placed insurance on the ZC Sterling force placed program.  See NYDFS Consent Order references in paragraphs 12-19 above.

48.     The NAIC has expressed concern with the "reverse competition" at play in the lender-placed insurance market whereby the insurers compete by offering mortgage lenders and servicers a share in the profits, rather than by offering lower prices.   On its website, the NAIC states:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obliged to pay the cost of the coverage.  Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lower price for coverage since the cost is born by the borrower.  Normally competitive forces tend to drive down costs for consumers.  However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.
> See http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm.

49.     Thus, the money that ZC Sterling/ QBE FIRST, kicked back to Wilshire in connection with force-placed insurance was not given in exchange for services provided.   It was simply the way it did business in a market dominated by reverse competition.  Under this highly profitable force-placed insurance scheme, Wilshire was incentivized to purchase the high-priced force-placed insurance policies from the QBE Defendants, rather than simply renew the lower priced insurance policy obtained by the borrower in the open market, because the QBE policy provided kickbacks and other benefits to  Wilshire and/or its affiliates.

50.     Upon information and belief, Wilshire entered agreements with ZC Sterling/QBE FIRST for below cost loan portfolio monitoring and tracking services.  The QBE Defendants were able to provide these services at below cost because of the enormous profits

---

[3] On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

they make from their premiums charged for force-placed insurance.   However, because insurance-lapsed mortgaged property generally comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who paid these premiums, like Plaintiffs, unfairly bear the entire cost to service and monitor or track the entire loan portfolio of Wilshire. Indeed, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") after observing that the existing force-placed insurance system "may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide [loan] tracking, rather than those that offer the best pricing and terms."

51.     Wilshire and the QBE Defendants also may have overcharged borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form insurance agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date  of  termination, and therefore "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

52.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage.  When Wilshire and/or the QBE Defendants added the cost of the high-price premium to a homeowner's mortgage balance, it thereby increased the interest paid over the life of the loan by the homeowner to the lender.

53.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize Defendants' profits at the expense of Plaintiffs and the other borrowers who comprise the Class.  Borrowers who for whatever reason have stopped

paying for insurance or are under-insured on mortgaged property, are charged amounts which reflect inflated and illegitimate noncompetitive "premiums" for force-placed insurance.    These "premiums" are inflated to finance undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force placement of the individual policies) and administrative services.

54.    Plaintiffs here do not challenge Wilshire's right to force place insurance in the first instance.   Plaintiffs instead challenge the manner and methods used by Wilshire in purchasing force-placed hazard insurance through pre-arranged agreements with the QBE Defendants, resulting in kickbacks and other improper financial benefits to Defendants, the high cost of which is charged to the borrower.

## CLASS ALLEGATIONS

### A.  Class Definitions

55.    Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated. Plaintiffs seek to represent the following Class and Subclass:

> Nationwide class:
> All borrowers who, within the applicable statutes of limitation, were charged by Wilshire for a force-placed hazard insurance policy placed on property through ZC Sterling and/or QBE FIRST,  and/or their affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

> New Jersey Subclass as to Counts III and IV –
> New Jersey Consumer Fraud Act.

> All borrowers who, within the applicable statutes of limitation, were charged by Wilshire for a force-placed hazard insurance policy placed on property located within the State  of New Jersey, through ZC Sterling and/or QBE FIRST and/or their affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

56.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class and Subclass before the Court determines whether certification is appropriate.

57.     Wilshire and the QBE Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B. <u>Numerosity</u>**

58.     The proposed Class is so numerous that joinder of all members would be impracticable.  Wilshire and the QBE Defendants, and/or their affiliates and successors in interest, sold and serviced hundreds of thousands of mortgage loans and insurance policies in the State of New Jersey and nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.   The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.   Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C. <u>Commonality</u>**

59.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims.  These common questions predominate over any questions that go to any individual member of the Class.  Among such common questions of law and fact are the following:

a.   Whether Wilshire and the QBE Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Wilshire had no risk of loss;

b.   Whether Wilshire breached the mortgage contracts with Plaintiffs and the Class by selecting higher priced force-placed insurance policies in order to receive illegal kickbacks (including unwarranted commissions) and by charging the higher costs to Plaintiffs and the Class;

c. Whether Wilshire breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated insurance charges to Plaintiffs and the Class;

d. Whether Wilshire manipulated force-placed insurance purchases in order to maximize its profits to the detriment of Plaintiffs and the Class;

e.   Whether Wilshire performed any work or services in exchange for the "commissions" or other "compensation" it collected in connection with the force placed insurance;

f.   Whether Wilshire and the QBE Defendants employed unconscionable commercial practices, misrepresentations, fraud, false pretenses, false promises, or the knowing, concealment, suppression, or omission of any material fact, with intent that others rely upon such concealment, suppression or omission by the arrangement between Wilshire and the QBE Defendants, which incentivized Wilshire to select force-placed policies with inflated premiums and unnecessary fees in order to receive illegal kickbacks (including unwarranted commissions) in violation of the New Jersey Consumer Fraud Act and pass on the cost of the kickbacks to borrowers through inflated charges;

g. Whether the QBE Defendants intentionally and unjustifiably interfered with the Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

h.   Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Wilshire and the QBE Defendants' conduct.

**D.  Typicality**

60.     Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are

typical of the respective Class and Subclass claims because of the similarity, uniformity, and

common purpose of the unlawful conduct of Wilshire and the QBE Defendants. Each Class member has sustained damages in the same manner as Plaintiffs as a result of the wrongful conduct of the Defendants.

### E.  Adequacy of Representation

61.     Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of that Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent him. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

62.     To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F.  Requirements of Fed. R. Civ. P. 23(b)(3)

63.     The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Wilshire and the QBE Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

64.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

65.     As a result, when determining whether common questions predominate,

courts focus on the liability issue, and if the liability issue is common to the Class as is the case

at bar, common questions will be held to predominate over individual questions.

### G..  Superiority

66.     A class action is superior to individual actions in part because of the non-

exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience
> for the affected customers as they reside all across the states;

> (b) Individual claims by Class members are impractical because the costs to pursue
> individual claims exceed the value of what any one Class member has at stake.   As
> a result, individual Class members have no interest in prosecuting and controlling
> separate actions;

> (c) There are no known individual Class members who are interested in individually
> controlling the prosecution of separate actions;

> (d) The interests of justice will be well served by resolving the common disputes of
> potential Class members in one forum;

> (e) Individual suits would not be cost effective or economically maintainable as
> individual actions; and

> (f) The action is manageable as a class action.

### H.  Requirements of Fed. R. Civ. P. 23(b)(1) & (2)

67.     Prosecuting separate actions by or against individual Class members would

create a risk of inconsistent or varying adjudications with respect to individual Class

members that would establish incompatible standards of conduct for the party opposing the

class.

68.     Defendants, as the predecessors and successors in interest to Wilshire and ZC

Sterling have acted or failed to act in a manner generally applicable to the Class, thereby

making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

### BREACH OF CONTRACT
(Against Wilshire, Defendants Bank of America, N.A., BAC Home Loans Servicing LP, IBM and/or Seterus, as successors in interest to Wilshire)

69.    Plaintiffs reallege and incorporate paragraphs 1-54, above as if fully set forth herein and further alleges as follows.

70.    Plaintiffs and all similarly situated Class members have mortgages that were owned and/or serviced by Wilshire.

71.    Wilshire was acquired by Bank of America Corporation, now Defendant Bank of America, N.A., in 2009. In March 2010, Defendant IBM acquired the assets of Wilshire from BAC and made Wilshire part of its Lender Business Process Services unit, which it renamed Seterus in 2011.  BAC retained the bulk of the servicing rights and related assets of Wilshire, which were incorporated into BAC Home Loans Servicing, LP, now defendant BANA.

72.    Plaintiffs and the other Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Wilshire.   The force-placed provisions from Plaintiffs' mortgage are set forth above in paragraph 39, and excerpts from a true and correct copy of the  mortgage agreement is attached to this complaint as **Exhibit A**.

73.     Plaintiffs' mortgage requires that they maintain insurance on their property and provides that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

74.     Wilshire charged borrowers for costs it attributed to force-placed policies with inflated premiums which it selected in order to gain unearned "commissions" or kickbacks, as well as bundled administrative services and other impermissible benefits. These so-called "costs", however, are extraneous to the actual cost of the insurance placed on Plaintiffs' property. Wilshire's conduct exceeded the bounds of what is "reasonable or appropriate" to protect Wilshire's rights or risk in the collateral for borrowers' mortgage loans. Wilshire breached the mortgage agreements by, among other things, charging Plaintiffs and Class members for inflated premiums for the sole purpose of its financial gain.

75.     Wilshire also breached Plaintiffs' and the Class members' mortgage agreements by charging Plaintiffs and the Class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect Wilshire's rights in their collateral or cover its risk.

76.     Plaintiffs and the Class members have suffered damages as a result of Wilshire's breaches of contract.

**WHEREFORE**, Plaintiffs James and Barbra Bowles, on behalf of themselves and all similarly situated Class members, seek compensatory damages from Wilshire and/or Bank of America, N.A., BAC Home Loans Servicing, LP, IBM and/or Seterus, and/or their related affiliates or subsidiaries, as successors in interest to Wilshire, resulting from Wilshire's breach of contract. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

28

## COUNT II

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(Against Wilshire, Defendants Bank of America, N.A., BAC Home Loans Servicing, LP,
IBM and/or Seterus, as successors in interest to Wilshire)

77.     Plaintiffs reallege and incorporate paragraphs 1-54, above as if fully set forth

herein and further allege as follows.

78.     A covenant of good faith and fair dealing is implied in every contract and imposes

upon each party a duty of good faith and fair dealing in its performance.  Common law calls for

substantial compliance with the spirit, not just the letter, of a contract in its performance.

79.     Where an agreement affords one party the power to make a discretionary decision

without defined standards, the duty to act in good faith limits that party's ability to act

capriciously to contravene the reasonable contractual expectations of the other party.

80.     Plaintiffs' and the Class Members' mortgage contracts allowed Wilshire to force

place insurance coverage on the borrower in the event of a lapse in coverage, but do not define

standards for selecting an insurer or procuring an insurance policy.

81.     Wilshire was afforded substantial discretion in force-placing insurance coverage.

It was permitted to unilaterally choose the company from which it purchased force-placed

insurance and negotiate the price of the coverage it procured.   Wilshire had an obligation to

exercise its discretion in good faith, and not capriciously or in bad faith.

82.     The purpose of the mortgage clause allowing a lender, like Wilshire, to force

place insurance is to protect the lender's interest in the property that is collateral for the

mortgage.  Wilshire breached the implied covenant of good faith and fair dealing by making

additional profits at Plaintiffs' expense by force-placing insurance on his property and receiving kickbacks

29

on that insurance, rather than placing insurance to protect its interest in the property. Wilshire further breached the implied covenant of good faith and fair dealing by, among other things:

(a) Manipulating the force-placed insurance market by selecting insurers (here, the QBE Defendants) that will pay kickbacks to Wilshire and issue excess insurance coverage not necessary to cover Wilshire's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from the QBE Defendants without seeking a competitive price;

(b) Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies that pay illegal and wrongful kickbacks to maximize Wilshire's own profits;

(c) Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

(d) Allowing Wilshire to collect a percentage of the premium that it then charged to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrowers, thereby creating the incentive to seek the highest-priced premiums possible;

(e) Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

(f) Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of administering its entire mortgage portfolio, which is not properly chargeable exclusively to Plaintiffs or the Class;

(g) Force-placing insurance coverage that is duplicative of existing coverage, or in excess of what is required by borrowers' mortgage agreements; and

(h) Force-placing insurance coverage in excess of that required to cover the lender's or servicer's interest in the property, or the balance owed on the loan.

83.     As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs James and Barbra Bowles, on behalf of themselves and similarly situated Class members, seek a judicial declaration that Wilshire's conduct in selecting

force-placed insurance policies with inflated premiums in order to gain illegal kickbacks and other forms of improper compensation violated the duties of good faith and fair dealing. Plaintiffs also seek compensatory damages from Wilshire and/or Bank of America, N.A., BAC Home Loans Servicing, LP, IBM and/or Seterus, and/or their related affiliates or subsidiaries, as successors in interest to Wilshire, resulting from Wilshire's breaches of its duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
(Against Wilshire, Defendants Bank of America, N.A., BAC Home Loans Servicing, LP., IBM and/or Seterus, as successors in interest to Wilshire)

84.      Plaintiffs reallege and incorporate paragraphs 1-54 above as if fully set forth herein and further alleges as follow.

85.      The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* (the "NJCFA"), prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation…in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

86.      Wilshire engaged in unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey. Wilshire had an exclusive relationship with its vendor and preferred insurance carrier whereby it would pay unreasonable and inflated premiums for force-placed insurance policies and charge that amount to Plaintiffs and the New Jersey Subclass, in order to then receive improper

31

compensation through illegal kickbacks based on a percentage of the insurance policy's premium.

87.     Wilshire and ZC Sterling made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiffs and the New Jersey Subclass.  ZC Sterling/QBE FIRST, with the approval of Wilshire, sent form letters to Plaintiffs stating that Wilshire would order force-placed coverage because Plaintiffs did not provide evidence of insurance in force on the property.

88.     For example, as set forth in detail above, Wilshire and/or ZC Sterling/QBE FIRST sent bi-annual notices to Plaintiffs that they would be charged for the "cost" of the force placed policy and that the charge for the cost of the force placed policy would be made to Plaintiffs' escrow account.  In or around February 25, 2010, Wilshire sent Plaintiffs an escrow statement reflecting a charge in January 2010 for "F/P Hazard Insurance" of $2,450.88.  This statement was false and misleading because the $2,450.88 did not represent the true cost of the force placed hazard insurance, but also included, unbeknownst to Plaintiffs, kickbacks and other wrongful benefits from ZC Sterling to Wilshire in exchange for Wilshire's agreement to have ZC Sterling as its preferred force placed insurance provider for the entire Wilshire loan portfolio.  The insurance premium charge also included amounts to pay for the kickbacks and other unlawful benefits that ZC Sterling provided to Wilshire, and did not reflect the actual cost of the insurance necessary to protect Wilshire's interest in the property..

89.     Wilshire deceived and misrepresented facts to Plaintiffs and the New Jersey Subclass in making these statements, creating the impression that borrowers were being charged for the cost of the necessary insurance coverage only.  In fact, Plaintiffs were being charged an amount at least two and sometimes three times greater than their voluntary coverage which

included costs extraneous to the actual cost of the insurance placed on Plaintiffs' property. Unbeknownst to Plaintiffs and the Class, Wilshire had selected the QBE Defendants' policies because the QBE Defendants paid kickbacks and other wrongful benefits to Wilshire, the cost of which was being passed on to Plaintiffs and the Class under the guise of the force placed premium.

90.     The NJCFA further provides that "[a]NY person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction." N.J.S.A. 56:9-19.

91.     Plaintiffs and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A. 56:8-1(d).

92.     Plaintiffs and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of Wilshire's unconscionable practices. Wilshire had an exclusive relationship with the QBE Defendants, whereby Wilshire agreed to select the  QBE Defendants' force-placed policies, which carried unreasonable and inflated premiums, and charge the inflated costs to Plaintiffs and the New Jersey Subclass.   Wilshire made this selection because the QBE Defendants would kick back a set percentage of the inflated premiums to Wilshire as an unearned commission or funnel other financial benefits to Wilshire.

93.     Pursuant to the terms of the standard form mortgage agreements used by Wilshire, it would purchase the required hazard coverage and charge the Plaintiffs and New Jersey Subclass' escrow accounts for the premiums.  Thus, as part of the scheme by Defendants, Wilshire imposed inflated charges upon Plaintiffs and the New Jersey Subclass in order to receive the QBE Defendants' kickbacks and other wrongful benefits they conveyed to Wilshire.

94.     Plaintiffs and the New Jersey Subclass have a private right of action against Wilshire and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person's interest, as well as an award of reasonable attorney's fees, filing fees and reasonable costs of suit.  N.J.S.A. 56:8-19.

**WHEREFORE,** Plaintiffs, on behalf of himself and the New Jersey Subclass, demands judgment against Wilshire and/or Bank of America, N.A., BAC Home Loans Servicing, LP, IBM and/or Seterus, and/or their related affiliates or subsidiaries, as successors in interest to Wilshire for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT IV

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
(Against Defendants ZC Sterling, QBE FIRST and QBE Insurance)

95.     Plaintiffs reallege and incorporate paragraphs 1-54 above as if fully set forth herein and further allege as follow.

96.     The NJCFA prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

97.     The QBE Defendants engaged in unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  ZC Sterling/QBE FIRST had a relationship with Wilshire, whereby it would incentivize

Wilshire to select their force-placed insurance policies with unreasonable and inflated premiums knowing that Wilshire would impose charges upon Plaintiffs  and the New Jersey Subclass in amounts equal to the inflated premium amounts.  As compensation, the QBE Defendants would kick back a set percentage of the inflated premiums to Wilshire as an unearned commission as a means to funnel financial benefits to them.

98.     The QBE Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiffs and the New Jersey Subclass.  ZC Sterling/QBE FIRST, with the approval of  Wilshire, sent form letters to Plaintiffs stating that Wilshire would order force-placed coverage because Plaintiffs did not provide evidence of insurance in force on the property. Defendants also represented in the letter that the "cost" of insurance for the lender-placed  policy would be added to Plaintiffs' loan balance and charged to Plaintiffs' escrow account.  Defendants further represented that Plaintiffs could obtain his own coverage, send proof of such coverage to Defendants, and they would refund any unearned portion of the premium.

99.     In or around February 25, 2010, Defendants Wilshire and/or ZC Sterling sent Plaintiffs an escrow statement reflecting a charge in January 2010 for "F/P Hazard Insurance" of $2,450.88. This statement was false and misleading because the $2,450.88 did not represent the true cost of the force placed hazard insurance, but also included, unbeknownst to Plaintiffs, kickbacks and other wrongful benefits from ZC Sterling to Wilshire in exchange for Wilshire's agreement to have the QBE Defendants as its preferred force placed insurance provider for the entire Wilshire loan portfolio.  The insurance premium charge also included amounts to pay for the kickbacks and other unlawful benefits that the QBE Defendants provided to Wilshire, and did not reflect the actual cost of the insurance necessary to protect Wilshire's interest in the property.

100.    Defendants deceived and misrepresented to Plaintiffs and the New Jersey Subclass in making these statements, creating the impression that the borrowers were being charged for the cost of the necessary insurance coverage.  In fact, Plaintiffs and the Class were being charged an amount greater than their voluntary coverage because Wilshire had selected the QBE insurance policies in order to obtain the unearned kickbacks and other wrongful benefits from the Force-Placed Insurance Provider Defendants.

101.    The NJCFA further provides that "[a]NY person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:9-19.

102.    Plaintiffs and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A. 56:8-1(d).

103.    Plaintiffs and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the QBE Defendants' unfair and unconscionable practices.  The QBE Defendants employed a scheme pursuant to which they would pay kickbacks and other financial benefits to Wilshire, in exchange for Wilshire selecting the QBE Defendants' force-placed insurance policies with inflated premiums that were more expensive than Plaintiffs and the Subclass's voluntary policies.

104.    Pursuant to the terms of the standard form mortgage agreements used by Wilshire, it would purchase the required hazard coverage and charge the Plaintiffs and New Jersey Subclass' escrow accounts for the premiums.  Thus, as part of the scheme by Defendants, Wilshire charged Plaintiffs and the New Jersey Subclass for the QBE Defendants' inflated premiums caused by the kickbacks and other wrongful benefits they conveyed to Wilshire.

105.    Plaintiffs and the New Jersey Subclass have a private right of action against the QBE Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person's interest, as well as an award of reasonable attorney's fees, filing fees and reasonable costs of suit.  N.J.S.A. 56:8-19.

WHEREFORE, Plaintiffs, on behalf of himself and the New Jersey Subclass, demands judgment against ZC Sterling, QBE, and QBE FIRST for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT V

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
(Against ZC Sterling, QBE FIRST, and QBE Insurance)

106.    Plaintiffs reallege and incorporate paragraphs 1-54, above as if fully set forth herein and further allege as follows.

107.    Plaintiffs and the Class members have advantageous business and contractual relationships with Wilshire pursuant to the mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

108.    The QBE Defendants had knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and Wilshire.  The QBE Defendants were not parties to the mortgage contracts, nor were they third-party beneficiaries of the mortgage contracts.  Further, the QBE Defendants did not have any beneficial or economic interest in the mortgage contracts.

109.   The QBE Defendants intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with Wilshire and their affiliates, whereby the QBE Defendants provided compensation (kickbacks, including, but not limited to, commissions, and low cost services) to Wilshire in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiffs and the Class.

110.   As a result of the QBE Defendants' interference with the Plaintiffs' mortgage agreement, the escrow funds of Plaintiffs which were designated to pay insurance, taxes and other items were used to pay non-designated costs of Defendants, including kickbacks and low cost loan tracking services for the Wilshire loan portfolio.

111.   Plaintiffs and the Class have been damaged as a result of the Force-Placed Insurance Defendants' interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges in connection with the force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs James and Barbra Bowles, on behalf of himself and all Class Members similarly situated, seeks a judgment in their favor against ZC Sterling, QBE FIRST and QBE Insurance for the actual damages suffered by them as a result of their tortious interference. Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT VI

### BREACH OF FIDUCIARY DUTY
(Against Wilshire, Defendants Bank of America, N.A., BAC Home Loans Servicing, LP, IBM and/or Seterus, as successors in interest to Wilshire)

112.    Plaintiffs reallege and incorporate paragraphs 1-54, above as if fully set forth herein and further allege as follows.

113.    Wilshire held funds in escrow on behalf of borrowers whose mortgages they service.   These funds were designated for the purpose of paying insurance premiums as they came due, and any excess funds were to be returned to Plaintiffs and members of the Class under the terms of the mortgage agreements.

114.    Wilshire was obligated to hold, manage and control any escrow funds in trust and owed Plaintiffs the highest fiduciary duty with respect to the handling of escrow funds. Wilshire was in a fiduciary relationship with Plaintiffs and the Class because Wilshire received a greater economic benefit from these transactions than it would from a typical escrow transaction.   Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Wilshire took it upon itself to manage borrowers' escrow accounts and then withdrew money from borrowers' escrow accounts to pay force-placed insurance premiums. Wilshire violated its fiduciary duties when it arranged to receive unlawful kickbacks or other compensation, which is clearly a greater economic benefit than what was contemplated under the mortgages, and by using the escrow funds to pay for these items which are unrelated to the actual providing of force-placed insurance.

115.    Wilshire breached its fiduciary duties owed to Plaintiffs and the other members of the proposed class by: (1) not acting in the borrowers' best interest when Wilshire profited from force-placed insurance policies which included kickbacks and other unlawful and

unearned fees to Defendants; (2) using the escrow funds which Wilshire held for the benefit of Plaintiffs and the other Class members to pay for these kickbacks and other unlawful financial benefits; and (3) not disclosing the kickback scheme to Plaintiffs and Class Members. Wilshire thus used the borrowers' escrow funds which were under its control to gain a monetary benefit at the expense of Plaintiffs and the other members of the Class.

116. These actions were undertaken by Wilshire in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Class members.

117. As a direct result of Wilshire's actions and subversion of Plaintiffs' interest to its own in reaping kickbacks and other unearned financial benefits, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiffs James and Barbra Bowles and the proposed Class are entitled to damages for Wilshire's breaches of its fiduciary obligations and misappropriation of escrow funds against Wilshire and/or Defendants Bank of America, N.A., BAC Home Loans Servicing, LP, IBM and/or Seterus, and/or their related affiliates or subsidiaries, as successors in interest to Wilshire**.** In addition, Plaintiffs and the proposed Class are entitled to punitive damages because Wilshire acted in bad faith in deliberate or reckless disregard of both the borrowers' rights and Wilshire's obligation to hold the borrowers' escrow funds in trust.

## COUNT VII

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)
(Against all Defendants)

118. Plaintiffs reallege and incorporate paragraphs 1- 54 above as if fully set forth herein.

40

119.    At all relevant times, Wilshire and the QBE Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

120.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Wilshire, ZC Sterling QBE FIRST and QBE.

121.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class Members to pay unreasonably high premiums for force-placed insurance through a scheme that inflated such premiums to cover kickbacks and expenses associated with monitoring Wilshire's entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

122.    The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.  Equitable tolling applies to this claim because Defendants fraudulently concealed their wrongful acts.

123.    Wilshire, ZC Sterling, QBE FIRST and QBE conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

41

124.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.  For example, ZC Sterling, with the approval of Wilshire, sent form letters to Plaintiffs on Wilshire letterhead, stating that Wilshire had ordered force-placed coverage because Plaintiffs had not provided evidence of insurance on the property.

125.    Defendants represented in the letter dated December 4, 2009, that "[y]ou will be responsible for any costs we which result from our purchase of the insurance." ."  Defendants' statement was false and misleading because Plaintiffs were not charged for the actual cost of the insurance, but for charges in excess of the actual cost because Wilshire had selected the significantly more expensive policies which ZC Sterling procured from, *inter alia*, the QBE Defendants in order to receive kickbacks and other wrongful benefits from the ZC Sterling and the QBE Defendants.

126.    Wilshire and the QBE Defendants also represented in the letter that the "cost" of insurance for the lender-placed policy would be applied to Plaintiffs' loan balance.   Wilshire and the QBE Defendants further represented that Plaintiffs could obtain their own coverage, send proof of such coverage to Wilshire and the QBE Defendants, and they would refund any unearned portion of the premium.

127.    Wilshire and the QBE Defendants deceived and misrepresented to Plaintiffs and the New Jersey Subclass in making these statements, creating the impression that they were being charged for the cost of the necessary insurance coverage.  In fact, they were being charged an amount greater than their voluntary coverage, and greater than the actual cost of the

insurance, because Wilshire had selected the QBE insurance policies in order to obtain the kickbacks and other wrongful benefits from the QBE Defendants.

128.   In making these statements, Wilshire, ZC Sterling and the QBE Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that Plaintiffs was charged represented the actual "cost" of the insurance and/or that is was authorized to impose costs extraneous to the insurance, including kickbacks and improper expenses, under the Loan Agreement or Mortgage.  Wilshire and the QBE Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Wilshire and the Force-Placed Insurance Provider Defendants a colorable reason to impose unreasonably high charges upon Plaintiffs for unreasonably high premiums and would have influenced Plaintiffs' decisions whether to pay the premiums, take steps to renew the voluntary coverage or contest the charges.  One such letter was sent to Plaintiffs in December 2009 and the escrow statement reflecting the supposed "cost" of the force placed hazard insurance charged in January 2010, was sent to Plaintiffs by Wilshire, and/or the QBE Defendants on or around February 25, 2010.

129.   For the purpose of executing the scheme to defraud, Wilshire, and the QBE Defendants sent, mailed and transmitted,  or caused to be  sent, mailed or  transmitted, in interstate  or foreign  commerce, numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class Members that they could charge Plaintiffs and Class Members for unreasonably high force-placed insurance premiums. Wilshire and the QBE Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class Members, in violation of the wire fraud statutes.

130.    Wilshire and the QBE Defendants directed and controlled the enterprise by:

a.    developing and implementing guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance;

b.    drafting of the language of the letters and correspondence to borrowers that was specifically designed to deceive borrowers related to what was the "cost" of the insurance purchased for them;

c.    directing, controlling, and creating an enterprise and arrangement where Wilshire would receive unearned commissions (ultimately charged to borrowers) for performing no work to earn said commissions;

d.    directing, controlling, and creating an enterprise and program where Wilshire never charged the borrowers its actual or effective cost to procure the lender placed policies;

e.    directing, controlling, and creating an enterprise and program where Wilshire and/or the QBE Defendants caused debits to the borrowers escrow accounts amounts which are not the actual or effective cost for lender placed insurance;

f.    designing and directing an exclusive enterprise arrangement by which Wilshire and the QBE Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance. The charges are inflated to provide Wilshire and its affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted services, such as loan tracking for the entire Wilshire mortgage portfolio. The QBE Defendants benefit by securing business from Wilshire while the QBE Defendants provide kickbacks to Wilshire at the expense of the borrowers upon whom are imposed the inflated charges;

g.    developing and implementing guidelines and criteria to determine when force-placed insurance is placed an a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered lapsed time periods where no claims were made and/or resulted in "double coverage;" and

h.    developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

131.     In order to further its control and direction of the enterprise, the QBE Defendants paid bribes and kickbacks to Wilshire in the form of unearned commissions and below cost services.

132.     By reason and as a result of Wilshire and the QBE Defendants' conduct and participation in the racketeering activity alleged herein, Wilshire and/or the QBE Defendants have caused damages to Plaintiffs and Class Members in the form of unreasonable and unnecessary force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS, 18 U.S.C. § 1962(d) (Against all Defendants)

133.     Plaintiffs reallege and incorporate paragraphs 1- 56 and 119-132 of this Complaint as if fully set forth herein.  Plaintiffs further allege as follows:

134.     At all relevant times, Wilshire and the QBE Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).   Wilshire and the QBE Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).  Equitable tolling applies to this claim because Defendants fraudulently concealed their wrongful acts.

135.     Wilshire and the QBE Defendants agreed that the QBE Defendants would be Wilshire's exclusive force-placed insurance provider and would extract monies from

Wilshire customers under the guise of insurance costs.   Wilshire and the QBE Defendants also agreed that the QBE Defendants would pay kickbacks to Wilshire.

136.    Wilshire and the QBE Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

137.    As a result of Wilshire and the QBE Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class Member suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class and the New Jersey Subclass;

(2)    Awarding damages from Wilshire and/or Defendants Bank of America, N.A., BAC Home Loans Serving, LP, IBM and/or Seterus, and/or their related affiliates and subsidiaries, as successors in interest to Wilshire, as sustained by Plaintiffs and the Class as a result of Wilshire's breaches of the subject mortgage contracts, the implied covenant of good faith and fair dealing and fiduciary duty, together with pre-judgment interest;

46

(4)     Awarding Plaintiffs and the New Jersey Subclass compensatory and treble damages, injunctive relief, declaratory relief, attorneys' fees, and costs under the New Jersey Consumer Fraud Act;

(5)     Awarding damages sustained by Plaintiffs and the Class as a result of ZC Sterling and/or QBE Defendants' tortious interference with the mortgage agreement;

(6)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute;

(7)     awarding punitive damages;

(8)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs and the Class's counsel and experts, and reimbursement of expenses; and

(9)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 12th day of January, 2015.

By:  s/ Roosevelt N. Nesmith

| | |
|---|---|
| Roosevelt N. Nesmith, Esq.<br>roosevelt@nesmithlaw.com<br>**LAW OFFICE OF**<br>**ROOSEVELT N. NESMITH, LLC**<br>363 Bloomfield Avenue, Suite 2C<br>Montclair, NJ  07042<br>Telephone:  (973) 259-6990<br>Facsimile: (866) 848-1368<br>*Counsel for Plaintiffs and the Class* | Catherine E. Anderson, Esq.<br>canderson@gslawny.com<br>Jason Solotaroff, Esq.<br>jsolataroff@gslawny.com<br>**GISKAN SOLOTAROFF,**<br>**ANDERSON & STEWART, LLP**<br>11 Broadway, Suite 2150<br>New York, NY 10004<br>Telephone: (212) 847-8315<br>Facsimile: (646) 520-3236<br>*Counsel for Plaintiffs  and the Class* |